UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO: 20-55 |
| v. | * | SECTION: "F" (4) |
| JASON R. WILLIAMS<br>NICOLE E. BURDETT | * | |
| * * * | | |

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

The government's opposition is most noteworthy for what it does not say. The government does not assure the Court that Councilman Williams and Ms. Burdett were indicted by a grand jury that fairly represented our community, free from racial discrimination. The government does not deny that the investigation into Mr. Williams was based on a referral by a political opponent, nor does it address the obvious impact of the indictment on the Orleans Parish District Attorney's race. And the government does not explain why an historic pandemic is not an "extraordinary circumstance" that would permit the Court to exercise its supervisory jurisdiction and allow discovery in this matter. The government's failure to address these issues, combined with the indictment of a declared candidate on the eve of the election qualification deadline, demands the Court's intervention.

**I.   The government does not credibly explain why it indicted Councilman Williams on the eve of the qualification deadline for the Orleans Parish District Attorney's race.**

Ignoring the elephant in the room—the November 2020 election—the government offers two reasons for indicting Councilman Williams less than a month before the qualification deadline. First, the government suggests that the indictment of Mr. Williams and Ms. Burdett was "normal" because the grand jury returned four other indictments on the same day. Second, the government points to an alleged prescription problem. Neither of these excuses rings true.

1

### A.      The four other June 26 indictments presented public safety and constitutional concerns absent from the present case.

None of the four other indictments returned on June 26 are remotely similar to Mr. Williams' case (nor do any involve a declared candidate for the November 2020 election). First, the four other indictments were returned against defendants who had already been detained on federal complaints, thereby raising constitutional issues about pretrial detention during the COVID-19 lockdown. Second, three of the four cases involved weapons or drug charges, obviously presenting public safety concerns.[1] And in the fourth case, the defendants had been arrested at the beginning of the pandemic lockdown in March 2020 and detained without indictment for more than three months.[2] These are the types of cases that may warrant an exception to the Eastern District's suspension of the grand jury during the COVID pandemic. A tax case against a declared political candidate does not.

### B.      If the government's reason for investigating Mr. Williams is to be believed, there should have been no prescription problems.

In rejecting the defendants' suggestion that the timing of the indictment interferes with the November 2020 election, the government contends that "this case is about Jason Williams' longstanding history of tax fraud" and his "extensive history of failing to pay the IRS." The government also suggests that it indicted Mr. Williams on June 26 because of a "prescription problem." In other words, the government argues that it charged Mr. Williams at this particular

---

[1] In *United States v. Julius Alexander* (Crim. No. 20-57), the government indicted Mr. Alexander, an alleged "gang leader" with a felony record, for being a convicted felon in possession of a firearm. Before his indictment, Mr. Alexander had been arrested on a complaint (Mag. No. 20-58) and was ordered detained on June 23, 2020. In *United States v. Jamal Bazley and Dwight Anderson* (Crim. No. 20-58), Mr. Bazley and Mr. Alexander, both previously convicted felons with a history of drug and firearms violations, had been in federal custody since June 11 and June 15 on federal firearms charges, after being caught fleeing a car containing a semi-automatic rifle, two handguns, and a ski mask. In *United States v. Demetrius Fiorentino* (Crim. No. 20-56), Mr. Fiorentino had been in federal custody since June 1, 2020 on a complaint alleging that he possessed more than six kilograms of cocaine.

[2] In *United States v. Thierno O. Bah and Manuela Gonzalez-Bookman* (Crim. No. 20-59), Mr. Bah and Ms. Gonzalez-Bookman had been detained on federal bank fraud and aggravated identity theft charges since March 16, 2020.

time because it had completed a long-term tax investigation and could not let Mr. Williams' "long history" of tax violations remain unanswered for even one more day.  However, this was not a long-term tax investigation, but a recent development in the government's years-long pursuit of Mr. Williams; and the government's argument must be rejected for several reasons.

First, the government fails to mention that Mr. Williams' "long history" with the IRS involves minor tax problems that have been resolved for almost a decade, and that did not even result in a civil audit, much less a criminal prosecution.

Second, although the government has apparently been hunting Mr. Williams for years, the alleged tax violations are a recent development.  The grand jury subpoenas to Mr. Williams bear a grand jury number of **2017**R00460-97, indicating that the government has been using the grand jury to investigate Mr. Williams since 2017.  Coincidentally, in February 2017, Mr. Williams began receiving threats that the current District Attorney would retaliate against him for announcing that he would be running for District Attorney in 2020.  Interestingly, the government does not deny that it initiated an investigation into Mr. Williams based on a referral from a political opponent; and it cannot deny that it issued its first tax subpoena to Mr. Williams on April 23, 2019, suggesting that the first two years of investigation had been fruitless.

Third, even if the government is correct that **one** of the 11 counts against Mr. Williams and Ms. Burdett may have prescribed on June 27, 2020, there was never a request for a tolling agreement, although the defendants had been in communication with the government and had vociferously raised the specter of election interference with the Department of Justice.

Fourth, the government concedes that it did not receive DOJ tax approval for the potentially-prescribed count (Count 7) until June 18, 2020—a week before the indictment. This eleventh hour approval belies the government's alleged long-term tax investigation; indeed, a cynic might conclude that Count 7 was used to justify a June 26 indictment.

The only reason there is a prescription problem here is that the government has been investigating a person, and trying to find a crime, since 2017. Surely, if this case started as a tax investigation in 2017, the government would not have waited to obtain tax division approval until June 18, 2020—one week before the alleged prescription deadline—and would not be in its current predicament. Clearly, there was another, obvious reason for the government's rush to indict: the July 24 qualification deadline and the November 3 election.

II.   **The government does not represent that the grand jury quorum which indicted Mr. Williams and Ms. Burdett constituted a representative cross section, free from racial discrimination, and the Court has authority to allow discovery on this issue.**

For all the reasons set forth in the defendants' original memorandum, the COVID-19 pandemic *must have* negatively impacted the government's ability to summon a quorum of grand jurors that reflects a fair cross section of the community and *must have* negatively impacted the deliberations of the grand jury that indicted Mr. Williams and Ms. Burdett, just as the pandemic has negatively impacted nearly every aspect of life in this country. Based on this obvious premise, the defendants simply seek discovery to determine whether there was racial discrimination in the process by which a quorum of the grand jury was reached, and whether a fair cross section of grand jurors participated in their indictment.

Tellingly, the government does not allay the defendants' concerns by representing to the Court that the grand jurors who indicted Mr. Williams and Ms. Burdett did in fact reflect a fair cross section of this community, or that the process for obtaining a quorum was free from racial

discrimination. Instead, the government relies on the superficial procedural argument that if the grand jury were properly empaneled in August 2019, the defendants cannot question a particular quorum because "**[i]f that were the case, then every grand jury session held across the country could be attacked each and every time they convene**." Rec. Doc. 30 at 6 (emphasis added).

But this is not a garden variety case. Here, the government indicted a declared political candidate on the eve of qualifications for the election, while the grand jury was suspended during an historic global pandemic. Under the circumstances, the specter of grand jury abuse and government interference in an election looms large.

And important constitutional issues are at stake. This case presents separate due process, equal protection, and fair cross-section concerns, and the government asks the Court to ignore all of them. *See Mosley v. Dretke*, 370 F.3d 467 (5th Cir. 2004) (due process and equal protection challenges to discrimination in the grand jury are distinct challenges); *Murphy v. Johnson*, 205 F.3d 809 (5th Cir. 2000) (fair cross-section requirement as applied to grand jury selection procedures).

**A.     Due process requires a charging body free from racial discrimination.**

In *Hobby v. United States*, 468 U.S. 339 (1984), the Supreme Court recognized a defendant's constitutional due process right to be indicted only upon presentment to a charging body free from racial discrimination. The particular question in *Hobby* was whether discrimination in the selection of a grand jury foreman warranted dismissal of an indictment. Because the duties of a federal grand jury foreman are merely "ministerial," the Court held that discrimination in selecting a foreman from a properly convened grand jury did not require reversal. *Id.* at 345. The Court's determination turned on whether the role of the foreman was

5

"so significant to the administration of justice that discrimination in the appointment of that office impugns the fundamental fairness of the process itself so as to undermine the integrity of the indictment." *Id.*

Here, it is the "charging body" itself—the quorum of the grand jury that voted on June 26—that may have been infected by racial discrimination. *See Vasquez v. Hillery*, 474 U.S. 254, 264 (1986). The *same day* that the quorum voted to return an indictment, the Chief Judge of this Court issued COVID-19 General Order No. 20-9, finding that the Court had a "reduced ability to obtain an adequate spectrum of jurors." *See* COVID-19 General Order No. 20-9 (June 26, 2020). The grand jury from which the quorum was selected was also subject to the Governor's June 4 Proclamation ordering that individuals at higher risk of COVID-19 should stay home—which, for the reasons set forth in defendants' opening memorandum, disproportionately affected African Americans.

Accordingly, the defendants seek discovery to learn whether there was racial discrimination in convening the quorum that indicted them. That quorum had the authority "to act in a manner that determines or influences whether an individual is to be prosecuted," and its composition is subject to judicial review. *Hobby*, 468 U.S. at 345. Indeed, the "taint attributable to a charging body selected on the basis of race" cannot be cured without quashing an indictment returned by a tainted charging body. *Vasquez*, 474 U.S. at 264.

> **B.  Equal protection and the constitution's fair cross section requirement demand inclusion of African Americans in the grand jury that returned the indictment.**

From an equal protection standpoint, the defendants seek discovery to determine whether African Americans were excluded from the quorum that was convened. *See Rose v. Mitchell*, 443 U.S. 545, 565 (1979). African Americans are certainly a recognizable class which, as a

6

result of the disproportionate impact of the COVID-19 epidemic upon them, is impacted differently by the Governor's stay-home proclamation—as recognized in this Court's General COVID-19 Order NO. 20-9.  The selection procedure used for summoning a grand jury—typically having the clerk's office call grand jurors until a quorum is reached—is not racially neutral against the backdrop of the pandemic and the truly extraordinary circumstances present in our district.  The government asks the Court to deny any inquiry into what actually happened here.

As for the fair-cross section requirement, the concern is also with the "grand jury selection process."  *Murphy v. Johnson*, 205 F.3d 809, 818 (5th Cir. 2000).  Clearly, under the extraordinary circumstances present in this case, African Americans are disproportionately prevented from participating in a grand jury quorum.

C. **The Court should permit discovery.**

The investigation of Mr. Williams began in 2017, on a matter unrelated to taxes.  It also began around the same time that Mr. Williams received threats from a political rival for declaring his intention to run for Orleans Parish District Attorney.  Two years later, the investigation evolved into a tax case—the merits of which are hotly disputed—and resulted in an indictment on the eve of qualifications for the very same Orleans Parish District Attorney's race.  If this were not enough reason for concern, the government felt the urgent need to obtain an indictment while the grand jury was suspended amid an unprecedented global pandemic.  In so doing, the government has placed Mr. Williams in a situation in which he likely will not be able to clear his name at a trial before the November 3, 2020 election.

Shockingly, the government contends that this is not an "extraordinary situation" that would permit this Court to exercise its supervisory power to safeguard the integrity of the grand

jury process.  On the contrary, these extraordinary circumstances clearly raise the potential of grand jury abuse, and the Court has ample reason to safeguard the integrity of the grand jury process by permitting the defendants to obtain discovery about the grand jury that returned an indictment against them.  Accordingly, the defendants respectfully request that the Court order the government and the Clerk of Court to produce the materials requested in their original memorandum.

### III.  The government's speedy trial argument is circular.

Finally, the government does not meaningfully address the deprivation of the defendants' speedy trial rights, which will certainly occur as a result of the government's decision to indict during a pandemic.  Instead, the government argues that the Speedy Trial Act cannot be violated so long as jury trials are suspended.  But the type of prejudice that the Speedy Trial Act is intended to prevent—the impact on the defendants' reputations, the stress of being under indictment, and for Councilman Williams the effect upon a November election—is still present.

And as with the grand jury issues, the government conflates two different standards: the statutory right and the constitutional right.  The government cannot decide to indict while jury trials are suspended, and simply brush off the defendants' inability to bring this case to trial.

The Supreme Court has held that a defendant may not complain that the government has denied him a speedy trial if the government has "prosecuted its case with customary promptness."  *Doggett v. United States*, 505 U.S. 647, 652 (1992).  Here, as a result of its decision to indict at this particular time—for the questionable reasons it has given—the government cannot prosecute with "customary promptness."  Accordingly, it is within the Court's discretion whether the remaining factors of *Barker v. Wingo*—the length of delay, the reason for the delay, the defendants' assertion of their speedy trial right, and prejudice—warrant

dismissal of the indictment. 407 U.S. 530. Although the speedy trial deadline may not yet have passed, the government's actions have all but guaranteed that it will.

## CONCLUSION

For the reasons stated above, the defendants respectfully request that the Court permit discovery into the government's reasons for seeking an indictment at this particular time and into the composition of the grand jury quorum that returned the indictment.

Respectfully submitted,

| | |
|---|---|
| *s/Michael W. Magner* | */s/ William P. Gibbens* |
| MICHAEL W. MAGNER (#1206) | William P. Gibbens, 27225 |
| AVERY B. PARDEE (#31280) | SCHONEKAS, EVANS, MCGOEY |
| Jones Walker LLP | & MCEACHIN, L.L.C. |
| 201 St. Charles Ave., Suite 5100 | 909 Poydras Street, Suite 1600 |
| New Orleans, LA 70170 | New Orleans, Louisiana 70112 |
| Telephone (504) 582-8316 | (504) 680-6065 |
| apardee@joneswalker.com | billy@semmlaw.com |
| mmagner@joneswalker.com | |
| | *Attorney for Jason R. Williams* |
| *Attorneys for Nicole E. Burdett* | |