UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL  ACTION

v.                                          NO. 20-55

JASON WILLIAMS AND NICOLE BURDETT           SECTION "F"

ORDER AND REASONS

Before the Court is the defendants' motion for discovery, evidentiary hearing, and to dismiss indictment for grand jury discrimination and deprivation of speedy trial rights.  For the reasons that follow, the motion is GRANTED with respect to discovery and DENIED without prejudice as to the remaining requested relief, to be re-urged depending on the outcome of discovery.

**Background**

A local criminal defense attorney and city councilman along with his law partner were indicted on federal tax fraud charges on the eve of the councilman's announced and official qualification to run for Orleans Parish District Attorney and in the midst of the COVID-19 pandemic that prompted the Court to suspend grand

1

jury proceedings and jury trials.  Innocent unless and until proven guilty of the federal charges, but likely unable to obtain a speedy trial before the November 3 election, the city councilman and his law partner now seek limited discovery from the government and Clerk of Court concerning the government's timing motivation for prosecution as well as the racial composition of and the process undertaken to summon the specially-convened grand jury and the quorum that voted to indict on June 26, 2020.

## Pre-Indictment

Jason R. Williams is an attorney and public official who presently serves as a Councilmember-At-Large for New Orleans City Council, the legislative branch of New Orleans City government. Councilman Williams recently qualified to run, and formally entered the race, for the office of District Attorney for Orleans Parish; the election is scheduled for November 3, 2020.  Councilman Williams heads his law firm, Jason Rogers Williams & Associates LLC, which focuses on criminal defense.  Nicole E. Burdett is one of Mr. Williams' law partners.  She also performs certain administrative functions for the firm.

When Councilman Williams publicly declared his intent to run for District Attorney in 2017, he was allegedly threatened by an individual affiliated with a political rival concerning his intent

to run for the office of DA.  During that same year, 2017, the federal government began a grand jury investigation of Councilman Williams.[1]  It is claimed that the federal government initiated an investigation into him based on a referral from a political rival; given that the government first issued a tax subpoena to Mr. Williams on April 23, 2019 -- years after initially investigating him for other matters -- the first two years of the non-tax-related federal investigation had been fruitless.

In March 2020, the State of Louisiana and this District in particular began to realize the impacts of COVID-19, which is caused by a coronavirus called SARS-CoV-2.  Since COVID-19 became a global pandemic and was declared a national emergency, ordinary life has been disrupted, as have operations of businesses, governments, and courts around the country.  To combat the spread of the disease and acknowledging the severity of risks presented by this public health emergency, the Chief Judge of this Court has issued several administrative orders extending deadlines and, most notably, suspending criminal jury trials and grand jury proceedings in the Eastern District of Louisiana.  See, e.g., COVID-19 GENERAL ORDER NO. 20-6 (April 24, 2020)(amending prior

---

[1] Grand jury subpoenas to Mr. Williams bear a grand jury number of 2017R00460-97, indicating to counsel for Mr. Williams that the government has been using the grand jury to investigate Williams since 2017.

order to suspend all jury trials until August 1, 2020, "due to the Court's reduced ability to obtain an adequate spectrum of jurors and the effect of the recommendations from ... public health organizations on the ability of counsel and Court staff to be present in the courtroom [and specifically finding] that the ends of justice [are] served by ordering the postponements outweigh the best interest of the public and any defendant's right to a speedy trial[;]" and suspending all grand jury proceedings "until August 1, 2020, subject to change upon motion from the government and further orders of the Court[.]"); see also COVID-19 GENERAL ORDER NO. 20-9 (June 26, 2020)(extending suspension of jury trials until October 5, 2020 and continuing to observe that the Court has a "reduced ability to obtain an adequate spectrum of jurors" and expressly finding that "the ends of justice [are] served by ordering the postponements outweigh the best interest of the public and any defendant's right to a speedy trial[.]").

### Grand Jury/Indictment

In the midst of the COVID-19 pandemic, when jury trials and grand jury proceedings have been and continue to be suspended, qualifying for the November 3, 2020 election for Orleans Parish District Attorney was scheduled for July 22, 2020. Just three weeks before this qualification deadline, on June 26, 2020, a

specially-convened federal grand jury returned an 11-count indictment, charging Jason R. Williams and Nicole E. Burdett with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 1); five counts of aiding and assisting in the preparation and presentation of false and fraudulent tax returns, in violation of 26 U.S.C. § 7206(2) (Counts 2, 3, 4, 5, and 6);[2] and five counts of failing to file IRS Forms 8300 relating to cash received in trade or business, in violation of 31 U.S.C. §§ 5331 and 5322 (Counts 7, 8, 9, 10, and 11).[3]

This 11-count indictment was returned on June 26, 2020 by a grand jury originally empaneled in August of 2019. In addition to the Williams/Burdett indictment, four other indictments charging other individuals unrelated to this case were also returned by the grand jury on June 26, 2020. Given the Court's COVID-19 General

---

[2] Each charged § 7206(2) violation concerns an allegedly inflated Schedule C business expense in the amount of: $200,000 (tax year 2013; Count 2); $90,000 (tax year 2014; Count 3); $170,000 (tax year 2015; Count 4); $140,000 (tax year 2016; Count 5); $120,000 (tax year 2017; Count 6). The government alleges that the defendants misclassified personal expenses as business expenses and provided this false information to the tax preparer for inclusion on the Schedule C (profit and loss from a business) portion of Williams' tax returns; and that these allegedly fraudulent tax returns reduced Williams' tax liability in excess of $200,000.

[3] Each charged §§ 5331 and 5322 violation concerns an occasion in which Williams and Burdett allegedly failed to report cash payments in excess of $10,000 from clients for legal services; five occasions between June 2017 and August 2018, for a total of $66,516.

Order suspending grand jury proceedings until August 1, 2020, the defendants observe that the government must have requested and received special dispensation to convene the grand jury.  <u>See</u> COVID-19 GENERAL ORDER NO. 20-6 (April 24, 2020)(ordering that, "[f]or the reasons given above and below, all grand jury proceedings in this District are suspended until August 1, 2020, subject to change upon motion from the government and further orders of the Court.").

The government does not dispute that special dispensation was granted.  According to the prosecuting attorneys here,[4] the United States Attorney's Office for the Eastern District of Louisiana requested that the grand jury empaneled in August 2019 be ordered to meet on June 26, 2020.  Chief Judge Brown apparently granted the request; the grand jury met on June 26, 2020 and returned five indictments, one of which was the 11-count indictment charging Mr. Williams and Ms. Burdett with conspiracy to defraud the United States, income tax fraud, and failure to file forms relating to cash received in trade or business.  Meanwhile, Mr. Williams and Ms. Burdett initially appeared and have entered pleas of not guilty to the charges; a September 14, 2020 jury trial date was scheduled

---

[4] This case is being prosecuted by the U.S. Attorney's Office for the Western District of Louisiana after recusal by the U.S. Attorney's Office for the Eastern District of Louisiana.

consistent with the mandate of the Speedy Trial Act.[5]  On July 27, 2020, the Court granted the defendants' unopposed Rule 17(c) motion seeking permission to serve subpoenas on tax preparer Henry Timothy and B&B Accounting Services, LLC.

Separate and apart from defenses they will advance to the substantive charges, the defendants now challenge the government's motivation concerning the timing of the indictment.  They vigorously assert that the investigation was prompted by a political rival, the charges are politically-motivated, concocted by Mr. Timothy, and brought at a time (i) to maximize interference with the upcoming DA election; (ii) when there could not possibly be a fair cross-section of grand jurors to return an indictment; and (iii) when obtaining a speedy trial is impossible. They now seek discovery from the government and the Clerk of Court into matters of grand jury composition, which the defendants plan to use to support a motion to dismiss the indictment.

I.

The singular issue presented by the defendants' motion is quite limited: are the defendants entitled to discover the process

---

[5] Considering that the Court's administrative order has suspended all jury trials until October 5, 2020, however, the parties belabor no illusion that any jury trial will proceed before October 2020.

for specially convening the grand jury on June 26 as well as the racial composition of the grand jury quorum returning the indictment?  The defendants' arguments framing their request, insofar as they bear on prosecutorial motivation, implicate the Court's limited supervisory capacity over prosecution prerogatives.  These principles in the context of the unique process leading up to a federal tax fraud indictment frame the debate.

*A.*

*Prosecutorial Discretion*

In our federal criminal justice system, "[t]he Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." United States v. Armstrong, 517 U.S. 456, 464 (1996)(citing Wayte v. United States, 470 U.S. 598, 607 (1985)).  The breadth of this discretion finds its source in statute and constitutional separation-of-powers doctrine.  See id. ("[t]hey have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed.")(citations omitted).  To be sure, "the decision to prosecute is particularly ill-suited to judicial review." Wayte, 470 U.S. at 607.  A "'presumption of regularity'

[attaches to] prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'"  Armstrong, 517 U.S. at 464 ("A selective-prosecution claim asks a court to exercise judicial power over a 'special province' of the Executive.").  Thus, ordinarily, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute and what charge to file or bring before a grand jury, generally rests entirely in his discretion."  Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978).

Though broad, prosecutorial discretion is not completely "unfettered[; s]electivity in the enforcement of criminal laws is ... subject to constitutional constraints."  Wayte, 470 U.S. at 608 (citing United States v. Batchelder, 442 U.S. 114, 125 (1979)). When presented with a selective or vindictive prosecution challenge, the Court may review decisions to prosecute in limited circumstances to ensure that the decision is not the product of individual or institutional abuse or "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights."  Id. (citing Bordenkircher, 434 U.S. at 364-65)); Armstrong, 517 U.S. at 464-65 (the equal protection clause of the Fifth Amendment forbids (selective) prosecution

9

based upon race, religion, or other arbitrary factor); United States v. Goodwin, 457 U.S. 368, 373 (1982)(prosecutorial vindictiveness is a due process violation for it "punish[es] a person because he has done what the law plainly allows him to do[,]" but it is difficult to prove considering that "[m]otives are complex and difficult to prove" and "[t]he imposition of punishment is the very purpose of virtually all criminal proceedings."). To succeed on a selective prosecution claim, the defendant must demonstrate that the prosecution had both a discriminatory effect and that it was motivated by a discriminatory purpose; and, the standard applicable to a request by a defendant seeking discovery from the government on a selective prosecution claim is "correspondingly rigorous." See Armstrong, 517 U.S. at 465-66, 468.

The Court's supervisory power being thus limited, the Department of Justice itself has developed its own policies to regulate or guide the exercise of its vast discretion. But it does not always follow them.[6] And neither the government nor the

---

[6] See, e.g., United States v. Hoffman, 901 F.3d 523, 541 n.9 (5th Cir. 2018)(observing that, in charging a defendant with 21 counts, which exceeded the DOJ internal policy ceiling of 15, the government violated its own policy to charge "as few separate counts as are reasonably necessary[;]" a policy intended to "promote the fair administration of justice, as well as the perception of justice").

defendants suggest that the Court has any police power to enforce the Department of Justice's own internal policies.  One which the defendants submit has been violated is the government's own Election Year Sensitivities policy, which provides:

> [P]olitics must play no role in the decisions of federal investigators or prosecutors regarding any investigations of criminal charges.
>
> Law enforcement officers and prosecutors may never select the timing of investigative steps or criminal charges for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party.

See Attorney General Memorandum for All Department of Justice Employees Concerning Election Year Sensitivities (March 9, 2012).[7]

The defendants invoke broad principles concerning their suspicion of outrageous government conduct and their constitutional right to due process.  See generally Rochin v. California, 342 U.S. 165, 169, 173 (1952); cf. United States v. Russell, 411 U.S. 423, 431-32 (1973).  To be sure, the Court is tasked with ensuring that all defendants' due process rights are respected, no matter their station in life.  The government dismisses any such political interference allegation, and insists that its timing in bringing the indictment was informed not by the

---

[7] Counsel for the government confirmed during oral argument that this policy remains applicable today.

11

November election, but instead by the internal workings of the
Justice Department Tax Division (discussed below) and the then-
approaching statute of limitations as to Count 7 (which would have
expired on June 27, 2020) and Count 2 (which will prescribe on
October 15, 2020).[8]

<em>B.</em>

<em>Federal Tax Prosecutions</em>

The Internal Revenue Service is an agency of the United States
Department of the Treasury vested with the institutional purpose
and responsibility for enforcing and administering the federal tax
laws and collecting taxes owed to the United States.  See United
States v. Harris, 628 F.2d 875, 879 (5th Cir. 1980)("The IRS is
duty bound to inquire after persons who may be liable for the
payment of taxes.")(citations omitted).  "The IRS splits the
responsibility for enforcing the nation's tax laws between its two
investigative divisions[,]" one criminal and one civil.  See United
States v. Peters, 153 F.3d 445, 447 (7th Cir. 1998).  The
Examination Division is responsible for conducting civil tax

_____

[8] The Court is not presented with an issue to resolve with respect
to election interference; the defendants raise the issue as one of
a confluence of factors, which they submit inform their request to
inquire into the special dispensation for convening a grand jury
on the eve of qualification for an election when grand jury
proceedings were otherwise suspended due to COVID-19.

audits[9] through revenue agents, whereas the Criminal Investigative Division investigates alleged criminal violations of the tax code and related federal statutes through special agents.[10]

Rather than a civil audit conducted by a revenue agent tasked with determining if an individual has underpaid his taxes, a criminal tax fraud investigation is conducted by the Criminal Division's special agents, whom must administer warnings before seeking information from taxpayers they investigate.  It is apparently not uncommon for either an audit or tax fraud investigation to be prompted by an informant, such as an ex-spouse calling the IRS to report allegedly improper tax reporting practices by a former spouse.  See, e.g., United States v. Peters, 153 F.3d 445, 447 (7th Cir. 1998)(former husband of defendant Dr. Peters called the IRS to report that he had information indicating that his former wife had cheated on her taxes); see also

---

[9] "An IRS audit is a review/examination of an ... individual's accounts and financial information to ensure the information is reported correctly according to the tax laws and to verify the reported amount of tax is correct." https://www.irs.gov/businesses/small-businesses-self-employed/irs-audits

[10] "The Internal Revenue Service Criminal Investigation Division conducts criminal investigations regarding alleged violations of the Internal Revenue Code [and related federal] statutes.  The findings of these investigations are referred to the Department of Justice for recommended prosecution." https://www.irs.gov/compliance/criminal-investigation/how-criminal-investigations-are-initiated

https://www.irs.gov/compliance/criminal-investigation/how-criminal-investigations-are-initiated ("Information is . . . routinely received from the public as well as from ongoing investigations underway by other law enforcement agencies[.]").

Unlike most federal criminal prosecutions, the United States Attorney's Office lacks the authority to decide whether to prosecute an individual for tax fraud.  Instead, the Tax Division of the U.S. Department of Justice is vested with the authority to refer alleged violations of IRS tax laws for prosecution. According to the government, the Tax Division approved Counts 1 through 6 of the indictment on April 27, 2020 and Counts 7 through 11 were approved on June 18, 2020.  Once all charges were approved for prosecution, the government indicates, the charges were presented to the next available grand jury meeting in the Eastern District of Louisiana; this occurred on June 26, 2020.  It happens that, the government contends, the statute of limitations for one of the counts presented and charged, Count 7, would have prescribed on June 27, 2020 (the day after the indictment issued) and another count, Count 2, would be time-barred if not brought before October 15, 2020.  This process and timeline for approving federal tax prosecutions and the statute of limitations set to prescribe for

certain counts informed its decision, it urges, to present to the grand jury on June 26, 2020.[11]

II.

Informed by this backdrop, the Court turns to consider the standard applicable to the defendants' request for discovery they seek to use to support a motion to dismiss the indictment.

*A.*

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). A party "must" raise by pretrial motion "a defect in instituting the prosecution, including...(iii) a violation of the constitutional right to a speedy trial; (iv) selective or vindictive prosecution; and (v) an

---

[11] Not surprisingly, the defendants reply: "We are skeptical." This skepticism is driven, in part, by the government's failure to offer or even discuss a tolling agreement. That is, despite being in regular communication with the government well before the indictment and despite being specifically advised as to Mr. Williams' intention to run for the DA election slated for November 2020, defense counsel during oral argument noted, the government never intimated as to, nor presented defense counsel with, a tolling agreement. Counsel for the government declined to reveal its motivation for opting not to extend what the defendants characterize as an ordinary, pre-indictment courtesy, a tolling agreement; instead, counsel for the government forcefully reiterated its position that it has pursued this case "in ordinary course."

error in the grand-jury proceeding[.]" Fed. R. Crim. P. 12(b)(3)
(A)(iii), (iv), (v).

### B.

The grand jury, "a constitutional fixture in its own right[,]"
is "functional[ly] independent[t]" of both the Judicial and
Executive Branches of government; it sits "to assess whether there
is adequate basis for bringing a criminal charge." See United
States v. Williams, 504 U.S. 36, 47-48, 50 (1992)(citations
omitted); Campbell v. Louisiana, 523 U.S. 392, 399 (1998)(citing
Vazquez v. Hillery, 474 U.S. 254, 263 (1986)(The grand jury
"controls not only the initial decision to indict, but also
significant decisions such as how many counts to charge and whether
to charge a greater or lesser offense[.]")).

Considering its structural and functional independence, the
judiciary's supervisory role over grand juries is quite limited.
Williams, 504 U.S. at 47-48.  The Court may "enforce the Grand
Jury Clause by ensuring that grand juries act independently from
the executive [and the Court exercises] supervisory power to
safeguard the integrity of the grand jury process." United States
v. Strouse, 286 F.3d 767, 771 (5th Cir. 2002).  In its supervisory
power, then, the Court may dismiss an indictment because of
misconduct before the grand jury under limited circumstances and

16

may "implement a remedy for violation of recognized rights[.]" Id. (citation omitted); United States v. Alvarado, 840 F.3d 184, 189 (4th Cir. 2016)("Defendants alleging grand jury abuse bear the burden of rebutting 'the presumption of regularity attache[d] to a grand jury's proceeding.'").

"[S]ecrecy is essential to maintaining the integrity of the grand jury system." In re Grand Jury Testimony, 832 F.2d 60, 62 (5th Cir. 1987); Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 218 (1979)("[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings."). But "[s]ecrecy is not absolute[.]" See In re Grand Jury Testimony, 832 F.2d at 62. Rule 6 of the Federal Rules of Criminal Procedure, which governs grand jury procedure, codifies the traditional secrecy rule and provides a few exceptions; subsection (e) of the Rule sets forth the limited circumstances under which the Court may authorize disclosure of matters before the grand jury.[12]

---

[12] Additionally, Rule 6(b) provides:
   **(b) Objection to the Grand Jury or to a Grand Juror.**
      **(1) Challenges.** Either the government or a defendant may challenge the grand jury on the ground that it was not lawfully drawn, summoned, or selected, and may challenge an individual juror on the ground that the juror is not legally qualified.
      **(2) Motion to Dismiss an Indictment.** A party may move to dismiss the indictment based on an objection to the grand jury or on an individual juror's lack of legal qualification[.]

Councilman Williams and Ms. Burdett invoke Rule 6(e)(3)(E)(ii), which provides:

> The court may authorize disclosure--at a time, in a manner, and subject to any other conditions that it directs--of a grand-jury matter...at the request of a defendant who shows that a ground *may* exist to dismiss the indictment because of a matter that occurred before the grand jury[.]

See Fed. R. Cr. P. 6(e)(3)(E)(ii)(emphasis added). Requests for disclosure of grand jury matters are directed to the Court's discretion, but requests should be "granted only if the moving party shows that 'a particularized need exists for the materials that outweighs the policy of secrecy.'" United States v. Smith, 697 Fed.Appx. 836, 837 (5th Cir. 2017)(unpublished, *per curiam*) (quoting United States v. Miramontez, 995 F.2d 56, 59 (5th Cir. 1993)). "Parties seeking grand jury transcripts under Rule 6(e)," for example, "must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." Douglas Oil, 441 U.S. at 222 (citation omitted)("a court called upon to determine whether grand jury transcripts should be released necessarily is infused with substantial discretion [and the court] may include protective limitations on the use of the disclosed material[.]").

18

*C.*

Here, the defendants do not seek to inspect transcripts; nor do they challenge the government's conduct in its particular presentation before the grand jury.  Rather, they seek to discover the circumstances under which the June 26 grand jury specially convened in light of the Court's General Order suspending grand juries absent special dispensation, and they seek to discover the process utilized to achieve a quorum, as well as whether the composition of the grand jury reflects the adverse impacts demonstrated by public health statistics, that is, whether the disproportionate impact the pandemic is having -- in disproportionately infecting and killing African Americans -- was reflected in the grand jury quorum which convened on June 26 to hand up several indictments, including the one in this case.

Mindful that the Court may authorize disclosure of a grand jury matter if the defendants "show[] that a ground may exist to dismiss the indictment," the Court turns briefly to consider what grounds the defendants suggest may serve to support a motion to dismiss the indictment.

Racial discrimination in the selection of grand jurors "strikes at the fundamental values of our judicial system and our society as a whole," and is "especially pernicious in the

19

administration of justice." Rose v. Mitchell, 443 U.S. 545, 555-56 (1979).  Simply put, racial discrimination is abhorrent.  Three separate constitutional provisions serve to protect a defendant's right that grand jury selection be free from racial discrimination: the Equal Protection and Due Process Clauses of the Fifth Amendment and the Sixth Amendment right to be tried by an impartial jury drawn from sources reflecting a fair cross-section of the community.

"[T]o show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of the members of a race or another identifiable group." Sosa v. Dretke, 133 Fed.Appx. 114, 126 (5th Cir. 2005)(citing Mitchell, 443 U.S. at 565).  The test for an equal protection violation has four parts:

> (1) the petitioner must establish the excluded group is a recognizable, distinct class, singled out for different treatment under [the] law, as written or as applied;
>
> (2) the degree of underrepresentation must be proved by comparing the population of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time;
>
> (3) there must be a selection procedure that is susceptible of abuse or is not racially neutral to support the presumption of discrimination raised by the statistical showing; and

20

(4) once the petitioner establishes the foregoing prima
facie case, the burden shifts to the [government] to
rebut the prima facie case.

Id. (citing Mitchell, 443 U.S. at 565).

In addition to the equal protection right, "the Sixth
Amendment guarantees a criminal defendant the right to have his or
her jury chosen from a venire or panel representing a fair cross-
section of the community." Id. at 127 (citing Taylor v. Louisiana,
419 U.S. 522, 527-30 (1975)); Berghuis v. Smith, 559 U.S. 314, 319
(2010)("The Sixth Amendment secures to criminal defendants the
right to be tried by an impartial jury drawn from sources
reflecting a fair cross section of the community."). "In all
criminal prosecutions, the accused shall enjoy the right to a
speedy and public trial, by an impartial jury of the State and
district wherein the crime shall have been committed[.]" U.S.
CONST. amend. VI. "The Sixth Amendment requirement of a fair cross
section on the venire is a means of assuring, not a *representative*
jury (which the Constitution does not demand), but an *impartial*
one (which it does)." Holland v. Illinois, 493 U.S. 474, 480
(1990)(emphasis in original)("The fair-cross-section venire
requirement is ... not explicit in [the] text, but is derived from
the traditional understanding of how an 'impartial jury' is
assembled."). The Sixth Amendment's promise that all criminal

21

defendants are entitled to a trial by a "jury drawn from a pool broadly representative of the community ... as assurance of a diffused impartiality[,]" see Taylor, 419 U.S. at 530-31, means that a violation of this right occurs where "jury wheels, pools of names, panels, or venires from which juries are drawn ... exclude distinctive groups in the community." Duren v. Missouri, 439 U.S. 357, 363-64 (1979); Ambrose v. Booker, 684 F.3d 638, 645 (6th Cir. 2012)(noting "[t]he irrelevance of the composition of a single venire panel" because the Sixth Amendment "guarantees only the opportunity for a representative jury, not a representative jury itself[;]" and, "[t]he focus ... is on the procedure for selecting juries, and not the outcome of that process."). The defendant must show three things to establish a *prima facie* violation of the fair cross-section requirement:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;
>
> (2) that the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
>
> (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Id. (citing Duren, 439 U.S. at 364).

Finally, there is a Fifth Amendment due process right to be free from discriminatory selection of grand jurors; this

particular right is less clearly defined. "[D]ue process imposes limitations on the composition of [a grand] jury." <u>Peters v. Kiff</u>, 407 U.S. 493, 501 (1972)(noting that "due process is denied by circumstances that create the likelihood or the appearance of bias" and holding that "whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby denies him due process of law."); <u>Campbell v. Louisiana</u>, 523 U.S. 392, 400-01 (1998)("Our decision in <u>Peters v. Kiff</u> addressed the due process question, although a majority of Justices could not agree on a comprehensive statement of the rule or an appropriate remedy for any violation.").

*D.*

The defendants contend that the government's decision to summon a quorum of grand jurors during the Governor's stay-home order and despite the disproportionate impact of COVID-19 upon African Americans in the Eastern District raises the specter that Councilman Williams' and Ms. Burdett's constitutional equal protection, due process, and fair cross-section rights have been violated. The government counters that the defendants have not established that any equal protection, due process, or fair cross-section violations occurred. In fact, the government concludes

23

that the grand jury which returned this indictment on June 26,
2020 was empaneled in August 2019, before the onset of the COVID-
19 pandemic.   Because no defendant is guaranteed a jury of a
particular composition, the government argues, any irregularities
inherent in convening the grand jury during this pandemic could
not have violated the defendants' constitutional rights.   The
government suggests that the defendants fail to invoke any
authority to support their argument that the constitutional
requirements apply to every single session for which a grand jury
is convened.   Once a grand jury is properly empaneled, the argument
goes, there can be no challenge to the makeup of a quorum of the
grand jury on any particular day, no matter the irregularities in
calling the quorum to service.   Insofar as the government would
have the Court advise as to whether the defendants will succeed on
a motion to dismiss the indictment on one of the three recognized
constitutional bases for challenging grand jury selection
processes, the Court declines to embrace such a demanding standard
for a threshold discovery motion.   Contrary to the government's
position, the rule is not that secrecy is absolute unless the
defendant makes a showing that they will succeed on a motion to
dismiss if disclosure is granted.   Rule 6(e)(3)(E)(ii) permits
discovery upon defendant's request if he shows that a ground "may"
exist to dismiss the indictment.   If, no matter what, the

24

defendants will not succeed on their contemplated motion to dismiss, then the government will have the opportunity to oppose such a motion on the merits.[13]

Here, the defendants point to the reasonable potentiality for their need for the limited materials they seek. The defendants contend that they need the itemized information to evaluate whether to challenge the indictment. The defendants take issue with the process employed in specially convening a grand jury in contravention of the general emergency Court rule that grand jury proceedings were suspended. The defendants are concerned that the COVID-19 pandemic and its disproportionate impact upon African Americans unfairly impacted the process utilized by the Clerk's Office in summoning (and excusing) grand jurors to convene on June 26. As cause for concern the defendants offer the alarming public health statistics indicating the disproportionate impact COVID-19 has had on African Americans.

Considering the gravity of the criminal charges in this case, the defendants have reasonably "demonstrate[d] with particularity a 'compelling necessity' for the" limited scope of materials they

---

[13] By failing to brief the parameters of the due process right in particular, the government does not persuade the Court that the defendants' contemplated motion to dismiss is doomed to fail as a matter of law. That must await another day. It is not this Court's habit to speculate.

seek.  See In re Grand Jury Testimony, 832 F.2d at 62.  Without the materials they request, the defendants will not be able to evaluate whether they can present dismissal authority for any of three distinct challenges to the indictment on grounds of irregularities in grand jury selection.  The particularized need shown advances the purpose of safeguarding the integrity of the grand jury process and outweighs the policy of secrecy where, as here, the defendants seek no transcripts or documents that might reveal substantive matters and instead focus on discovering information that might, or might not, support a motion to dismiss the indictment for constitutional violations concerning the process undertaken to specially convene a grand jury when such proceedings were otherwise suspended.  By allowing disclosure of records concerning the process undertaken to convene the grand jury on June 26, the Court is not undermining its duty to safeguard the confidentiality of the proceedings, but, rather, allowing the defendants to discover information concerning a grand jury selection process that might have violated one of three of their constitutional rights.  Cf. United States v. Frye, No. 04-331, 2006 WL 8425614 (E.D. La. Apr. 6, 2006)(Vance, J.)(granting defendant's request for disclosure of records concerning the grand jury selection process and the qualifications of the individual grand jurors where defendant indicated he needed the information

to evaluate whether to challenge the indictment under Rule 6(b)(2), but denying defendant's request for transcripts of testimony presented to the grand jury and his request for the voting records for failure to make a particularized showing).  Defendants are not ordinarily entitled to the names of the members of the grand jury that indicted them;[14] the names are irrelevant to the information sought by the defendants.  For all of these reasons, the Court grants the defendants' request for discovery with the condition that the government and Clerk of Court must redact any grand juror names or personal identifying information before disclosure.

## III.

## Speedy Trial Rights

But the speedy trial issue is less than certain and must await a better focus by the parties.  The defendants contend that their speedy trial rights will be violated as a result of the government's decision to indict during a pandemic that has shuttered courthouse doors and impaired the ability to obtain an adequate spectrum of jurors.  The government helpfully counters

---

[14] Defendants are not ordinarily entitled to the names of the members of the grand jury that indicted them.  See In re Grand Jury Investigation, 903 F.2d 180, 182 (3d Cir. 1990)(citing United States v. McLernon, 746 F.2d 1098, 1122-23 (6th Cir. 1984)).  During oral argument, defense counsel confirmed that they do not seek grand juror names.

that it is premature to consider whether the defendants' speedy trial rights will be violated because the speedy trial clock has not run.

*A.*

*The Constitutional Right*

"In all criminal prosecutions," the Sixth Amendment guarantees, "the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend. VI.

Accused defendants are "shielded by the presumption of innocence, the 'bedrock[,] axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law." Betterman v. Montana, 136 S. Ct. 1609, 1614 (2016). This presumption is implemented by -- and "at the heart of" -- the Speedy Trial Clause of the Sixth Amendment by "prevent[ing] undue and oppressive incarceration prior to trial, ... minimize[ing] anxiety and concern accompanying public accusation[,] and ... limiting the possibilities that long delay will impair the ability of an accused to defend himself." Id. at 1614, 1617 (citation omitted)(Speedy Trial Clause "[r]eflect[s] the concern that a presumptively innocent person should not languish under an unresolved charge[.]").

The speedy trial right is unlike other constitutional rights. Barker v. Wingo, 407 U.S. 514, 519 (1972). The first difference is that, "[i]n addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused." Id. "A second difference," the Supreme Court has observed, "is that deprivation of the right may work to the accused's advantage." Id. at 521 ("unlike the right to counsel or the right to be free from self-incrimination, the deprivation of the right to a speedy trial does not per se prejudice the accused's ability to defend himself."). Finally, the right is "more vague concept[ually] than other procedural rights." Id. at 522. Given its "vague[,]" "amorphous[,]" "slippery[,]" and "necessarily relative" features, the Supreme Court has thus "refused to quantify the right into a specified number of days or months" and has eschewed "inflexible approaches" in favor of a "balancing test[.]" Id. at 523, 529; Vermont v. Brillon, 556 U.S. 81, 89 (2009).

The balancing test embraced in Barker v. Wingo, in which the conduct of both the prosecution and the defendant are weighed, is intended to eliminate some of the uncertainty in protecting the right's myriad purposes and in confining its literal breadth. 407 U.S. 514, 523 (1972); Doggett v. United States, 505 U.S. 647, 652

(1992)(observing that "the Speedy Trial Clause is written with such breadth that, taken literally, it would forbid the government to delay the trial of an 'accused' for any reason at all."). The Supreme Court endorsed consideration of a non-exhaustive list of factors, including "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Barker, 407 U.S. at 530.

The "length of delay" factor is also a "triggering mechanism" or threshold inquiry: a Barker analysis is triggered only if a delay is so long as to be "presumptively prejudicial." Doggett, 505 U.S. at 651-52; Barker, 407 U.S. at 530. Once triggered, no one factor is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial," and all "must be considered together with such other circumstances as may be relevant." Barker, 407 U.S. at 533.

In the Fifth Circuit, "[o]nce a speedy trial analysis is triggered," the Court "determines whether the first three Barker factors weigh so heavily in favor of the defendant that prejudice is presumed." United States v. Bishop, 629 F.3d 462, 465-66 (5th Cir. 2010)(citing United States v. Frye, 489 F.3d 201, 209 (5th Cir. 2007)). If no presumption of prejudice arises, "then the defendant bears the burden of establishing actual prejudice and

30

demonstrating that such prejudice is sufficient to outweigh the other three factors." Id. (citing Frye, 489 F.3d at 209).[15]

"[D]elays of less than five years are insufficient, by duration alone, to give rise to a presumption of prejudice and relieve the defendant of satisfying Barker's fourth prong." Bishop, 629 F.3d at 456-66 (citing cases in which delay of 17 months and 45 months insufficient). The second factor, reason for delay, is often critical. If delay is attributable entirely to the defendant or by some delay that serves a legitimate governmental purpose, the speedy trial right is not violated. United States v. Moreno, 789 F.3d 72, 79 (2d Cir. 2015)(citing Brillon, 556 U.S. at 90 and Doggett, 505 U.S. at 656).

---

[15] The Second Circuit helpfully articulates this distinction:

> [T]he notion of a delay that is presumptively prejudicial (i.e., long enough to trigger a Sixth Amendment inquiry) should not be confused with a delay that is so long as to cause presumptive prejudice (i.e., prejudice that need not be specifically shown). Compare Doggett, 505 U.S. at 652 with id. at 655-56[.] The former bears upon the need for a Barker analysis, whereas the latter bears upon the merits of that analysis.

United States v. Moreno, 789 F.3d 72, 78 n.3 (2d Cir. 2015).

*B.*

*The Statutory Right*

"Congress passed the Speedy Trial Act of 1974 ... to give effect to the" Sixth Amendment right.  Betterman, 136 S. Ct. at 1616.

The Speedy Trial Act provides that a defendant must go to trial within 70 days of either the issuance of an indictment or a defendant's first appearance before a judicial officer, whichever is later.  18 U.S.C. § 3161(c)(1).  If a defendant is not brought to trial within the 70-day window, the indictment against the defendant must be dismissed upon the defendant's motion.  See §3162(a)(2).  Dismissal may be with or without prejudice.  Id.

To accommodate pretrial proceedings and other circumstances, some flexibility is built into the Act, which provides for certain periods of time to be excluded from the 70-day clock.  See §3161(h)(1) - (8).  The Act requires that certain periods of time "shall be excluded ... in computing the time within which the trial of such offense must commence" including "[a]ny period of delay resulting from other proceedings concerning the defendant, including but not limited to ... delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion[.]"

32

§3161(h)(1)(D).    Time  is  automatically  excluded  under  this provision; no showing of actual delay in trial is required. United States v. Tinklenberg, 563 U.S. 647, 650 (2011).

The Act also permits the Court to exclude time that results from "a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of an attorney for the Government," if the Court's decision to grant the continuance was based on its "findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."  § 3161(h)(7)(A). The Act provides a non-exhaustive list of bases upon which an ends-of-justice continuance may be granted.  § 3161(h)(7)(B).  For time to be excludable under this provision, the Court must timely consider and articulate on the record the findings/reasons for the continuance.  See id.; see also Zedner v. Untied States, 547 U.S. 489, 498-99 (2006).

Of vital import here, the Act authorizes the Court to consider various factors in deciding whether an ends-of-justice exclusion is warranted; acceptable reasons include whether the failure to grant the continuance would result in a miscarriage of justice, whether the case is so complex that adequate trial preparation is impossible under the Act's time limits, and whether the failure to

33

continue would deny the defendant reasonable time to obtain counsel, or would deny counsel the time necessary for effective preparation. § 3161(h)(7)(B). At this stage of the proceedings, it seems to the Court that this issue is untimely; indeed, it is undeveloped.

***

Accordingly, IT IS ORDERED: that the defendants' motion for discovery, evidentiary hearing, and to dismiss for grand jury discrimination and deprivation of speedy trial rights is hereby GRANTED in part insofar as the defendants seek grand jury discovery and DENIED in part without prejudice as to the other relief sought.[16] IT IS FURTHER ORDERED: that the Department of Justice shall turn over to defense counsel the following items; personal identifying information, such as the names of grand jurors, shall be redacted before turned over to defense counsel:

    1. All letters from representatives of the United States Attorney's Office to the grand jurors convening the grand jury that sat on June 26, 2020.

    2. All letters or other communications calling the grand jurors for service on June 26, 2020.

    3. A record of the races of the grand jurors who were summoned for service on June 26, 2020.

---

[16] This discovery Order must be complied with within five days of this Order. All other issues shall be resolved timely by counsel in further motion practice.

4.   A record of the races of the grand jurors who constituted the quorum on June 26, 2020.

5.   A record of the number of jurors who constituted a quorum.

6.   Any and all records of responses by jurors that they would not report on June 26, 2020, and the stated basis for their failure to report.

7.   Any motions, requests, or communications the Department of Justice submitted to the Court seeking permission to convene the grand jury on June 26, 2020, and the Order of the Court authorizing the grand jury.

Finally, IT IS FURTHER ORDERED: that the Clerk of Court shall turn over to defense counsel the following items; personal identifying information, such as the names of grand jurors, shall be redacted before turned over to defense counsel:

1.   All letters or other communications calling the grand jurors for service on June 26, 2020.

2.   The demographic questionnaires for the grand jurors who were called for service on June 26, 2020.

3.   A record of the races of the grand jurors who were summoned for service on June 26, 2020.

4.   A record of the races of the grand jurors who constituted the quorum on June 26, 2020.

5.   Any records related to any grand jurors who were excused from service on June 26, 2020.

New Orleans, Louisiana, August 10, 2020

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

35